IN THE UNITED STATE DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 3:07-CR-122 |
| v. | ) | (PHILLIPS/SHIRLEY) |
| | ) | |
| CHRISTOPHER MUCKLE, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C. § 636(b) for disposition or report and recommendation regarding disposition by the district court as may be appropriate. This criminal action came before the Court on November 28, 2007, for a hearing on Defendant Muckle's Motion to Suppress. [Doc. 23] Assistant United States Attorney Brownlow Marsh was present representing the government. Attorney Paula Voss was present representing Defendant Muckle, who was also present. After the hearing, the Court granted the parties leave to file post hearing briefs, if they so chose. [Doc. 27] The government filed its brief [Doc. 29] on December 11, 2007. Defendant Reagan had until the end of business December 21, 2007, to file his post hearing response brief, but no such response was filed. Accordingly, the Court deemed the matter to be at issue, took the matter under advisement on December 22, 2007, and the matter is now ripe for adjudication.

Defendant Muckle ("Defendant") moves the Court to suppress all evidence obtained by law enforcement officers subsequent to Defendant's arrest on September 18, 2007. Defendant contends that law enforcement lacked the reasonable suspicion necessary to stop him, thus all

1

evidence obtained from the arrest subsequent to that stop should be suppressed. The government opposes the motion, arguing that the stop and subsequent arrest were constitutionally valid, and that any evidence obtained should not be suppressed.

I. **SUMMARY OF TESTIMONY**

A. **Testimony of Tyler Wylie**

The government called as its first witness Tyler Wylie ("Officer Wylie"), a police officer with the Knoxville Police Department (the "KPD"). [Tr. 4][1] Officer Wylie stated that he has been with the KPD for approximately two years. [Id.] Officer Wylie testified that on September 19, 2007, Officer Wylie was working the evening shift, which runs from approximately 2:00 p.m. to 11:30 p.m., on foot patrol in Walter P. Taylor Homes in Knoxville with his partner, Officer Clinton. [Tr. 4-5] Officer Wylie indicated that as the end of his shift approached, he and Officer Clinton were patrolling the east side of McConnell Street, just north of Bethel. [Tr. 5] Officer Wylie testified that Walter P. Taylor Homes is owned by the Knoxville Community Development Corporation ("KCDC"). [Id.] Officer Wylie further testified that Walter P. Taylor Homes is posted as private property, and that only residents with proper identification, or individuals escorted by residents, are allowed on site. [Tr. 5-6] Officer Wylie stated that he and his partner were on patrol to ensure that everyone they encountered was there for a lawful purpose. [Tr. 5]

Officer Wylie indicated that he had patrolled Walter P. Taylor Homes, off and on, for approximately eight months, during which time he had come to know the area fairly well and was familiar with some, but not all, of the residents. [Tr. 6] Officer Wylie testified that, based upon

---

[1]All citations to the transcript [Doc. 28] of the November 28, 2007 hearing are denoted by [Tr. ] and the appropriate page number or numbers.

his experience, Walter P. Taylor Homes is known as a high-crime area, but that, also based upon his experience, it is generally individuals who have no legal basis or reason for being in Walter P. Taylor Homes who are committing the crimes. [Tr. 6-7]

Officer Wylie was next asked to look at a diagram of the area of Walter P. Taylor Homes where the events at issue occurred. [Tr. 7] Officer Wylie stated that he, himself, did not draw the diagram, but that he was present when it was drawn and did offer advice on the layout of the drawing. [Id.] The diagram was later moved into evidence as Exhibit 2. [Tr. 54] Officer Wylie indicated that the oblong shape on Exhibit 2 represents an apartment building, and that the small circle between McConnell Street and the area denoted "Parking Lot Q" represents a light pole, which offered some illumination. [Tr. 8] Officer Wylie stated that the front doors of the apartments were on the west side of the building, facing McConnell Street, and that the apartments had back porches, some of which have porch lights, on the east side of the building. [Tr. 8-9] Officer Wylie indicated that, other than the light pole and the porch lights, there were no other sources of illumination. [Tr. 9]

Officer Wylie testified that, when he approached the area represented by Exhibit 2, from the east side of McConnell Street, he observed one individual. [Tr. 7-8] Officer Wylie indicated that individual was present in the courtroom. [Tr. 8] Officer Wylie stated that when he first observed Defendant, Defendant was standing in the area marked as "Parking Lot Q." [Tr. 9] Officer Wylie testified that there were automobiles in the parking lot, but that Defendant was not at an automobile. [Tr. 9] Officer Wylie indicated that he was coming from the area in between the two apartment buildings shown on Exhibit 2, but that he was not certain how far away he was from Defendant when the officer first saw Defendant. [Tr. 9-10] Officer Wylie stated that he thought that Defendant

3

also saw the officers and, at that point, began to walk away, toward McConnell Street and the front of the apartment building. [Tr. 10]

Officer Wylie stated that, when the Defendant started to move, Officer Wylie proceeded west along the side of the apartment building farthest from Defendant, while Officer Wylie's partner continued moving south along the back side of the apartment building toward Parking Lot Q. [Id.] Officer Wylie testified that, while moving toward the front of the building, he stayed in the shadows and trees, so that, if Defendant was trying to elude the officer, Defendant wouldn't be able to see him. [Id.] Officer Wylie indicated that, after coming around the side of the apartment building to the front, but while the officer was still in the shadows, he observed Defendant moving north along the front side of the apartments. [Tr. 10-11] Officer Wylie testified that Defendant was walking with his left-hand in his pocket, was picking up his pace, and was looking over his shoulder, but that Defendant didn't see Officer Wylie. [Tr. 11]

Officer Wylie stated that he turned his police radio down and then engaged Defendant when Defendant was approximately five feet from the officer's position. [Id.] Officer Wylie testified that he shined his flashlight at Defendant, so Defendant would know the officer was talking to him, and told Defendant to take his hand out of his pocket and to give the officer Defendant's identification. [Id.] Officer Wylie indicated that he asked Defendant to take his hand out of his pocket because, based upon the officer's experience and training, he was concerned that Defendant might have a weapon in his pocket. [Tr. 11-12] Officer Wylie stated that Defendant didn't say anything, but that the two just stared at each other for approximately five seconds. [Tr. 12] Officer Wylie testified that he then again directed Defendant to hand over his identification and to take his hand out of his pocket, to which Defendant responded "okay," and then Defendant turned and ran

4

back in the direction he had come, toward Lot Q. [Tr. 12]

Officer Wylie testified that he then chased after Defendant on foot, keeping Defendant in sight. [Tr. 13] Officer Wylie stated that as Defendant reached the south end of the apartment building, Officer Wylie's partner turned the corner and the two almost collided. [Id.] Officer Wylie indicated that his partner drew his gun to "low ready," ordered Defendant to take his hands out of his pockets, as Defendant had placed both hands in his pockets at this point, and to get down on the ground. [Id.] Officer Wylie testified that "low ready" meant to have the weapon drawn to a ready position, but pointed at the ground rather than a target, so that the weapon can be used, or holstered, as needed. [Tr. 14]

Officer Wylie stated that Defendant then placed his hands and knees on the ground, at which point Officer Wylie's partner holstered his gun. [Id.] Officer Wylie testified that once his partner put away his weapon, Defendant started to stand back up. [Id.] Officer Wylie indicated that as Defendant was standing back up, Officer Wylie finished closing the distance, got on Defendant's back, and "took him into custody." [Id.] Officer Wylie stated that when Defendant first took his hands out of his pockets, he placed his left hand in the air without any problem, but that his right hand made "a mix between a throwing motion and trying to hide that with just putting his hands in the air." [Id.] Officer Wylie testified that he saw a white object leave Defendants hand, travel through the air, and land somewhere in the middle of McConnell Street. [Tr. 14-15] Officer Wylie indicated that he did not retrieve the item. [Tr. 15]

On cross-examination, Officer Wylie testified that he was on duty as a KPD officer, and was not working as KCDC security. [Id.] Officer Wylie indicated that he did not have any exact statistics as to that area being a high-crime area, but that approximately two weeks before the night

5

in question a KPD officer's vehicle was shot in Parking Lot Q. [Tr. 16] Officer Wylie stated that, based upon his experience, nine times out of ten, the people he has arrested in Walter P. Taylor Homes did not live there, but had come there to buy or sell drugs, or commit some similar act. [Id.] Officer Wylie admitted that it was possible that some individuals could be coming to Walter P Taylor Homes to sell drugs to residents, but that in his experience that was not the case. [Tr. 17] Officer Wylie agreed that his experience was only based upon individuals he caught. [Id.]

Officer Wylie indicated that when he first saw Defendant, Defendant was just standing in Parking Lot Q. [Id.] Officer Wylie testified that Defendant was not selling drugs, breaking into cars, no one was approaching him, nor was he doing anything else illegal. [Id.] Officer Wylie stated that this was the first time he had ever seen Defendant, and that he wanted to speak with him to determine whether he was allowed to be in the area. [Tr. 18] Officer Wylie indicated that there had been no complaints called in on Defendant, he wasn't a suspect in some other crime, and the officers were not attempting to serve a warrant on Defendant. [Tr. 18-19]

Officer Wylie testified that when he sees someone just standing in a parking lot, especially in a high-crime area known for drug trafficking, that it piques his interest, and that he wants to confirm that the individual isn't there for some illegal purpose. [Tr. 19] Officer Wylie again stated that he had not seen Defendant doing anything illegal, but that because Defendant was just standing there, not doing anything else, at approximately 11:00 at night, that drew the officer's attention. [Id.] Officer Wylie agreed that it was not unusual to see people out in this area at night walking, or sitting on their porches, or engaging in some sort of social activity, but that Defendant was just standing there by himself in a parking lot, so the officer wanted to find out what was going on. [Tr. 20] Officer Wylie testified that he didn't see any obvious signs that Defendant was

6

committing a crime, but that, based upon the officer's experience and training, that people just standing around in Lot Q "might not be up to any good." [Id.]

Officer Wylie indicated that when Defendant originally left Parking Lot Q, the officer assumed Defendant was going to walk across McConnell, and that the officer was surprised when he saw Defendant walking toward him when the officer came around the building. [Tr. 21] Officer Wylie testified that, even if Defendant had crossed McConnell Street, the officer still would have wanted to talk to him because the officer felt that Defendant had seen the officers and then suddenly wanted to be away from the officers. [Id.] Officer Wylie stated that he is trained to take notice of when people appear to be attempting to avoid him. [Id.] Officer Wylie testified that, at that time, he was not aware of the Defendant having done anything illegal, but that he had a duty to ensure that Defendant was permitted on KCDC property. [Tr. 21-22]

Officer Wylie stated that there was only the one street light, and that he was standing at the end of the apartment building without any lighting, in the dark, but that he still felt that Defendant had seen the officers. [Tr. 22] Officer Wylie testified that, before Defendant ran, the officer had no reason to believe that Defendant was trying to avoid the officers, but that there was some level of assumption there. [Tr. 23] Officer Wylie indicated that it "wasn't a guess out of thin air," but was instead a "trained hunch." [Id.] Officer Wylie stated that he didn't believe that Defendant was going to look for someone's apartment, because of the way the sidewalk was set up, it would have made more sense for Defendant to just walk along the edge of the building by the doors, rather than taking the path Defendant followed, which required him to go up a small hill, which he then would have had to go back down if he wished to enter an apartment. [Tr. 24]

Officer Wylie agreed that it is possible Defendant could have had some innocent

7

reason for being there, but stated that he believed that in that case Defendant would have simply stayed where he was when he saw the officers. [Tr. 25] Officer Wylie testified that, when the officer first saw Defendant, the officer had done nothing to indicate that he wanted to speak to Defendant, so there was no way Defendant could have known the officers wanted to speak to him. [Tr. 26] Officer Wylie agreed that he assumed that Defendant was suddenly moving away because he was trying to avoid the officers. [Id.]

Officer Wylie indicated that he and his partner did not form a plan when Defendant initially left the parking lot, but rather the two just instinctively reacted, with one officer going one direction and the other officer going the other. [Tr. 26-27] Officer Wylie stated that, since he and his partner's shift would be ending soon, their goal was to patrol and check some IDs, to make their presence known. [Id.] Officer Wylie testified that he didn't plan on jumping out at Defendant in an attempt to scare him, but instead choose to remain concealed to lessen any possible danger the officer might face if Defendant were armed. [Tr. 27] Officer Wylie stated that as Defendant was moving north from the parking lot, that he was looking down, looking over his shoulder, and acting very nervously. [Tr. 28] Officer Wylie indicated that had Defendant looked to his right, he probably would have seen the officer, but that the officer had remained very quiet, so Defendant didn't think to look in that direction. [Id.]

Officer Wylie testified that Defendant probably was startled when Defendant encountered the officer at a distance of approximately five feet. [Id.] Officer Wylie stated that he stepped from the shadows at that point and was in the open, and that the officer was wearing his shiny badge and ID plate, as well as his police uniform. [Id.] Officer Wylie testified that he did not say anything to Defendant after Defendant started running, but instead thought that Defendant would

8

run into Officer Clinton. [Tr. 29] Officer Wylie indicated that he did not know for sure where his partner was, since he had lost sight of him. [Id.] Officer Wylie stated that as he was reaching for his radio, that was when Officer Clinton encountered Defendant. [Tr. 30] Officer Wylie testified that, because of the fence along McConnell, Defendant would have had to run all the way back to the parking lot area to access McConnell and cross the street. [Tr. 29-30]

**B.     Testimony of Thomas Clinton**

The government then called its next witness, Thomas Clinton ("Officer Clinton"), a police officer with the KPD. [Tr. 30] Officer Clinton testified that he had been with the KPD for approximately two years. [Tr. 31] Officer Clinton stated that on the evening of September 19, 2007, he was performing a walking patrol with Officer Wylie in Walter P. Taylor Homes. [Id.] Officer Clinton indicated that he was also being accompanied by a ride along, a civilian who had come along to observe. [Id.] Officer Clinton stated that KPD policy allowed the presence of ride alongs. [Id.]

Officer Clinton indicated that as they were approaching Parking Lot Q that night, he saw an individual standing in the parking lot. [Id.] Officer Clinton testified that he had never seen the individual before and identified the individual as Defendant. [Tr. 31-32] Officer Clinton stated that Defendant was just standing in the parking lot. [Tr. 32] Officer Clinton testified that as the officers approached Defendant, Defendant turned and walked toward McConnell Street and around the southwest corner of the building, where Officer Clinton lost sight of him. [Id.] Officer Clinton indicated that at the same time, Officer Wylie turned west, to go around the north side of the same building, while Officer Clinton and his ride along continued moving toward Parking Lot Q. [Tr. 32-33]

9

Officer Clinton testified that as he and his ride along turned the southwest corner of the building, he saw Defendant running back in Officer Clinton's direction, heading toward the light pole. [Tr. 33-34] Officer Clinton testified that there is a fence along McConnell, and that the only nearby gap in the fence was at the entrance to Parking Lot Q, the direction Defendant was running. [Tr. 34] Officer Clinton stated that he knew Officer Wylie had headed west around the north end of the same building, so he assumed that Defendant was running from Officer Wylie. [Id.] Officer Clinton testified that he told Defendant to "get on the ground," repeating himself several times. [Id.] Officer Clinton stated that at that point Defendant placed both of his hands in his pockets and "sidestepped," meaning Defendant continued to face east toward the officer, but was moving south. [Id.] Officer Clinton indicated that the officer began to draw his weapon and directed Defendant to get on the ground and take his hands out of his pockets. [Id.]

Officer Clinton testified that Defendant then took his hands out of his pockets, but that his right hand made a throwing motion, and that the officer saw Defendant throw a plastic bag onto McConnell Street. [Tr. 34-35] Officer Clinton stated that after throwing the bag, Defendant got down on his hands and knees. Officer Clinton indicated that he then holstered his weapon and began approaching Defendant, but that Defendant began to stand back up. [Tr. 35] Officer Clinton testified that he pushed Defendant back down, and that at about that same time Officer Wylie arrived, and the officers took Defendant into custody. [Id.]

Officer Clinton testified that it was approximately five to ten feet from where Defendant was standing to the edge of McConnell Street, and probably another five to ten feet into McConnell Street where the object landed. [Id.] Officer Clinton stated that the object landed at about the center of McConnell Street. [Id.] Officer Clinton indicated that, other than the officers,

10

the ride along, and Defendant, there was no one else around at the time in question. [Id.] Officer Clinton stated that there is a light pole in that area, so there was some illumination. [Tr. 35-36]

Officer Clinton testified that while the officers were taking Defendant into custody, the ride-along walked around to look at, but not touch, the object thrown by Defendant. [Tr. 36] Officer Clinton stated that he was focusing on placing Defendant in handcuffs, so he wasn't keeping his eyes on the ride along at all times. [Id.] Officer Clinton indicated that no one else approached the object other than the ride along. [Id.] Officer Clinton testified that after handcuffing Defendant, he walked around the fence and retrieved the object. [Tr. 36-37] Officer Clinton stated that the object was a round, white, rock-like substance that appeared to be crack cocaine. [Tr. 37] Officer Clinton indicated that the object was field tested at the scene and tested positive for cocaine. [Id.]

On cross-examination, Officer Clinton testified that he did not recognize Defendant on the night in question. [Tr. 37] Officer Clinton stated that, on the night in question, he was there in his capacity as a KPD officer, not as KCDC security. [Id.] Officer Clinton indicated that he did not know whether Defendant's name was on the KCDC "No Trespass" list, so he did not know whether Defendant was committing criminal trespass. [Tr. 37-38] Officer Clinton testified that when he first observed Defendant, he did not see Defendant doing anything illegal or exhibiting any kind of criminal behavior. [Tr. 39]

Officer Clinton stated that he did not know how long Defendant had been standing in the parking lot, nor could he tell whether Defendant was using a cell phone. [Id.] Officer Clinton indicated that he did not see Defendant looking over his shoulder. [Id.] Officer Clinton testified that there was one light pole in the area of the parking lot, but that it was darker in the area where the officers were standing when they first observed Defendant. [Tr. 40] Officer Clinton stated that

there were also lights on the back porches of some of the apartments. [Id.]

Officer Clinton was then shown a photograph, which the officer identified as depicting McConnell Street, facing north, with Parking Lot Q on the right. [Id.] The photograph was entered into evidence as Exhibit 1. [Tr. 41] Officer Clinton testified that Exhibit 1 showed the sign denoting Lot Q. [Tr. 40] Officer Clinton stated that the light pole referred to during the hearing was visible in the photograph, and marked Exhibit 1 with a black "X" on the light pole. [Tr. 41] Officer Clinton agreed that it was quite a bit darker in the area the officer was coming from than near the street. [Tr. 42]

Officer Clinton testified that Defendant was in the grassy area to the east of the fence when Officer Clinton ordered him to the ground. [Id.] Officer Clinton stated that he saw Defendant make a deliberate throwing motion. [Tr. 43] Officer Clinton indicated that he saw the thrown object travel approximately fifteen feet through the air toward the middle of McConnell Street. [Id.] Officer Clinton agreed that the thrown object had to travel over the grassy area between Defendant and the fence, travel over the fence, travel over the grassy area between the fence and McConnell Street, and then travel over a portion of McConnell Street before landing. [Id.] Officer Clinton testified that the bag was "pretty heavy." [Tr. 44]

Officer Clinton testified that he didn't find any dice or any other bags on the ground. [Id.] Officer Clinton stated that he was facing in the direction of the thrown object, and that no one other than the ride along was in that area. [Id.] Officer Clinton agreed that he was not able to keep his eyes fixed upon the thrown object the entire time. [Id.] Officer Clinton stated that the ride along was a citizen, in no way involved with KPD. [Tr. 44-45]

Officer Clinton testified that when Officer Clinton pulled his gun and directed

12

Defendant to take his hands out of his pockets and get on the ground, that is when Defendant pulled his hands out of his pockets, made a throwing motion, and got on the ground. [Tr. 45] Officer Clinton stated that when Defendant first came around the corner, Defendant was running, at which point Officer Clinton told Defendant to get on the ground. [Id.] Officer Clinton indicated that Defendant then placed his hands in his pockets and started side stepping with both hands in his pockets, at which point Officer Clinton drew his weapon. [Id.] Officer Clinton testified that he ordered Defendant to take his hands out of his pockets, at which point Defendant took his hands out of his pockets and made a throwing motion towards McConnell Street. [Id.] Officer Clinton testified that Defendant was not free to go once Officer Clinton had ordered him to the ground. [Tr. 46]

During argument, but not the subject of any proof, were references by both attorneys to a search and/or seizure of a baggie in Defendant's pants pockets containing a small white rock-like substance (defense attorney's version Tr. 58) or other cocaine found on Defendant while being placed in the paddy wagon (prosecuting attorney's version Tr. 57).

**II.     FINDINGS OF FACT**

The Court finds that September 18, 2007, at approximately 10:30 P.M., KPD Officers Clinton and Wylie were on duty, in the company of a civilian ride along, and were conducting a foot patrol through Walter P. Taylor Homes north of Parking Lot Q and east of McConnell Street. As the officers approached Parking Lot Q, walking along the rear of an apartment building, the officers observed Defendant standing, alone, in Parking Lot Q. The officers did not recognize Defendant, nor did they see Defendant performing any illegal acts, but the officers did believe that Defendant had likewise seen the officers. The area where the officers were standing when they first observed

13

Defendant was dark, though there was a small amount of light from some of the back porches of the apartments. The area near Parking Lot Q was light by one street lamp. The officers made no attempt to signal or communicate with Defendant at this point in time.

Shortly after the Officers saw Defendant, Defendant turned and began walking northwest, cutting through the parking lot towards the southwest corner of the apartment building and the front of the apartments. When the officers saw Defendant begin walking, Officer Wylie began walking around the north side of the apartment building, toward the northwest corner of the building, while Officer Clinton and the ride along continued walking south along the back of the apartment building toward the parking lot. Their intent was to identify Defendant to determine if he was legally on the premises. Both Officers lost sight of each other and also lost sight of Defendant.

Officer Wylie made his way around the north side of the apartment building, remaining in the trees and shadows near the northwest corner of the building. At that point, Officer Wylie observed Defendant moving north, in between the fence and the front of the apartment buildings, with his left hand in his pocket. Officer Wylie observed Defendant looking over his shoulder and acting nervously. Officer Wylie observed Defendant from the shadows as Defendant approached, and then Officer Wylie stepped out from the shadows into the lighted area when Defendant was approximately five feet away. Officer Wylie shined his flashlight in Defendant's direction and ordered Defendant to remove his hand from his pocket and to produce some identification. Defendant stopped and stared at Officer Wylie for approximately five seconds, keeping his left hand in his pocket. Officer Wylie again directed Defendant to remove his hand from his pocket and to produce some identification. Defendant said "okay," but then turned around and

14

began running south, back in the direction from which he had come, towards Parking Lot Q. Officer Wylie gave chase, but did not radio for help.

In the meantime, Officer Clinton and the ride along had continued walking, and upon arriving at the south end of the building, Officer Clinton and the ride along turned west and began moving toward the front of the apartments. As Officer Clinton neared the southwest corner of the building, Officer Clinton saw Defendant running toward him. Officer Clinton then ordered Defendant to get on the ground, repeating himself several times. Defendant placed both hands in his pockets, faced Officer Clinton, and began side stepping toward Parking Lot Q. Officer Clinton then drew his weapon and ordered Defendant to take his hands out of his pockets and to get on the ground. Defendant removed both hands from his pockets, placing them in the air. However, while placing his hands in the air, both officers observed Defendant throw an object in a plastic bag toward McConnell Street with his right hand. Defendant then got down on the ground. Officer Clinton holstered his weapon and approached Defendant, at which point Defendant began to get back up from the ground. Both officers arrived at Defendant at approximately the same time and Defendant was placed in handcuffs.

While the officers were detaining Defendant, the ride along walked around the fence and into McConnell Street in the direction that the officers had observed Defendant throw the plastic bag. No one else was in the area, nor did anyone else approach during this period. The ride along looked at, but did not touch, the plastic bag located near the middle of McConnell Street. After handcuffing Defendant, Officer Clinton walked over and found the plastic bag with a round, white, rock-like substance in it. The substance field tested positive for cocaine. The Court finds the testimony of both officers to have been credible, and not impeached by cross examination, nor

contradicted by any other testimony.

### III. POSITIONS OF THE PARTIES

Defendant argues that the police detained him without reasonable suspicion when Officer Wylie ordered Defendant to produce identification. Defendant contends that there was no evidence of any sort of criminal activity occurring, and thus the officers had no reason to stop him. Defendant further contends that because the police seized him without reasonable suspicion, that any evidence obtained or statements made should be suppressed. The government disagrees, arguing that because Defendant was on KCDC property, it was permissible for the police to ask Defendant for his identification. Thus, the government contends, there was no illegal seizure and the evidence should not be suppressed.

### IV. ANALYSIS

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend. IV. Thus, the Court must determine if and when Defendant was actually seized. Defendant contends that he was effectively seized when Officer Wylie asked for Defendant's identification. As noted above, when Officer Wylie approached Defendant, Officer Wylie shined his flashlight on Defendant and ordered Defendant to take his hand out of his pocket and to produce some identification. In response, Defendant stopped moving and stared at the officer for approximately five seconds. Officer Wylie then repeated his directive, to which Defendant said "okay," but turned and fled to the south.

In addressing this issue, the Sixth Circuit has held that "a seizure does not occur until the suspect is actually detained." United States v. Thomas, 77 Fed. App'x 862, 864 (6th Cir. 2003)

(citing United States v. Williams, 949 F.2d 220, 222 (6th Cir. 1991) (holding that an officer yelling "halt" does not constitute a seizure until the suspect actually stops, and anything suspect discards or attempts to discard before he stops is not the fruit of a seizure and can give probable cause for arrest)). In the instant case, Officer Wylie's directive to Defendant was to remove his hand from his pocket and to produce some identification. Defendant did not comply with Officer Wylie's request, but instead stared at Officer Wylie for approximately five seconds and then turned and ran. The Court finds that, given that Defendant in no way complied with Officer Wylie's directive, he was not seized. Although Defendant did pause for approximately five seconds, it is clear that Defendant was in no way under the officer's control and had in no way complied with the officer's directive or submitted to the officer's authority, as Defendant did not remove his hand from his pocket, nor did he produce any identification. Thus, no seizure occurred when Defendant first encountered Officer Wylie.

The Court next turns to Defendant's encounter with Officer Clinton. When Defendant encountered Officer Clinton, while running from Officer Wylie, Defendant was directed to get on the ground, but he again initially refused to do so, instead placing his hands in his pockets and continuing to sidestep away. It was only when Officer Clinton drew his weapon that Defendant removed his hands from his pockets, making what the officers described as a throwing motion. At that point, Defendant finally complied with Officer Clinton's directive and went to the ground. However, Defendant attempted to rise from the ground before the officers were able to handcuff Defendant. Given Defendant's continued resistance to the officers' directives, the Court finds that Defendant was not detained until physically apprehended, which occurred when the officers actually placed their hands on Defendant and handcuffed him. United States v. Bobo, 2 Fed. App'x 401,

17

2001 WL 45589, at *4 (6th Cir. Jan 10, 2001) ("No arrest could have occurred until the defendants either submitted to the officers' authority or until the officers physically seized defendants. Because the defendants fled, they were not 'seized' until physically apprehended.")

"No seizure occurs when there is a pursuit of a person attempting to evade police custody, and any evidence discarded or abandoned in the chase is not the fruit of a seizure." California v. Hodari D., 499 U.S. 621, 627 (1991). Further, the warrantless search and seizure of abandoned property does not violate the Fourth Amendment. Abel v. United States, 362 U.S. 217, 241 (1960); United States v. Caldwell, No. 99-6031, 2000 U.S. App. LEXIS 33893 (6th Cir. Dec. 19, 2000). Additionally, as noted above, the Sixth Circuit has held that any evidence discarded by a defendant while evading the police is considered abandoned, and can provide probable cause to arrest. Williams, 949 F.2d at 222. In the instant case, the government contends that Defendant discarded the bag of crack cocaine, and Defendant contends that the bag was not his. [Tr. 51] As such, Defendant effectively has no standing to challenge the seizure of the plastic bag thrown into McConnell Street or its contents. See Rawlings v. Kentucky, 448 U.S. 98, 104 (1980) (holding that those who deny ownership of certain property lose any standing they may have had to contest its seizure); Abel, 362 U.S. at 241 (holding that those who abandon property have no standing to challenge seizure). See also United States v. Dillard, 78 Fed. App'x 505 (6th Cir. 2003) (quoting State v. Oliver, 368 So.2d 1331, 1336 (Fla. Dist. Ct. App. 1979)) (holding that an individual who, immediately prior to an encounter with the police, threw a paper bag to the ground on a public street lost any reasonable expectation of privacy in the property).

Whether Defendant was actually in possession of the bag of cocaine is a matter that the government must prove at trial. However, based upon the unrefuted testimony of the officers,

18

the Court finds that, for the purposes of this motion, the officers did have probable cause to believe that Defendant was in possession of the bag of cocaine, which Defendant discarded. Even though Defendant discarded the bag before he was effectively seized, the officers observed him discard it, determined that the substance inside the bag field tested positive for cocaine, and it could form the basis for probable cause to arrest. Williams, 949 F.2d at 222. Thus, based on the evidence herein any search or seizure of a baggie from Defendant after this arrest, while loading him in a paddy wagon, would be valid as a search incident to arrest. Further, any statements made by Defendant (though none were established by the proof) were not the fruits of an illegal seizure and should not be suppressed for that reason. No other basis for suppression was proffered or argued.

## V.    CONCLUSION

For the foregoing reasons, the Court respectfully **RECOMMENDS** that Defendant Christopher Muckle's Motion to Suppress [Doc. 23] should be **DENIED**.[2]

Respectfully submitted,

  s/ C. Clifford Shirley, Jr.  
United States Magistrate Judge

---

[2] Any objections to this Report and Recommendation must be served and filed with the clerk of the court within ten (10) days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b), Fed. R. Civ. P. Failure to file objections within the time specified waives the right to appeal the District Court's order. Thomas v. Arn, 474 U.S. 140 (1985). The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general. Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. Smith v. Detroit Federation of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).